ROVER PIPELINE, LLC,

        Plaintiff,                                Civil Action No. 17-cv-10365

v                                          HON. MARK A. GOLDSMITH

1.23 ACRES OF LAND, MORE OR LESS,
PERMANENT EASEMENT
(PIPELINE RIGHT-OF-WAY SERVITUDE),
et al.,

        Defendants.
_____/

**OPINION & ORDER**
**DENYING WITHOUT PREJUDICE PLAINTIFF'S MOTION IN LIMINE TO
EXCLUDE EVIDENCE OF CONSUMERS ENERGY PIPELINE EXPLOSION (Dkt.
813); GRANTING PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF
ROUTE CHANGES (Dkt. 814); GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION IN LIMINE AS TO WAYNE ESCH (Dkt. 816); DENYING
PLAINTIFF'S MOTION IN LIMINE AS TO ERIC GARNDER AND MARK
KOENINGER (Dkt. 817); GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION IN LIMINE AS TO WILLIAM LAWRENCE AND ERIC
GARDNER (Dkt. 819); GRANTING IN PART AND DENYING IN PART PLAINTIFF'S
MOTION IN LIMINE AS TO FRANK TOKAR, JR. AND ERIC GARDNER (Dkt. 820);
GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION IN LIMINE
TO EXCLUDE EVIDENCE OF PRIOR EASEMENT PURCHASES AND
SETTLEMENTS (Dkt. 821); GRANTING DEFENDANTS' MOTION IN LIMINE AS TO
MIKE ISRANI AND RICHARD HURIAUX (Dkt. 822); DENYING DEFENDANTS'
MOTION IN LIMINE AS TO ANTHONY SANNA (Dkt. 823); DENYING
DEFENDANTS' MOTION IN LIMINE AS TO JEFFREY KERN AND DAVID
FALKENSTERN AND TO STRIKE SUPPLEMENTAL REPORT (Dkt. 824); AND
DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION IN LIMINE TO
EXCLUDE PIPELINE IMPACT STUDY (Dkt. 825)**

This matter is before the Court on several motions in limine brought by Plaintiffs (Dkts.

813-814, 816-821) and Defendant landowners (Dkts. 822-825). Most of the issues have been fully

briefed; for those without full briefing, the time to file has since passed. See E.D. Mich. LR

7.1(e)(2). The Court has dispensed with oral argument, as it will not aid in the decisional process.

<u>See</u> E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).  The disposition of each motion will be addressed below and summarized in the conclusion of this opinion and order.

## I. ANALYSIS

The majority of the motions in limine presently before the Court are those brought pursuant to <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  The Court will thus first address each <u>Daubert</u> motion, followed by a discussion of the remaining motions in limine.

### A. <u>Daubert</u> Motions

Under Federal Rule of Evidence 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if the following criteria are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 places a special obligation on the trial court to be a gatekeeper, ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."  <u>Daubert</u>, 509 U.S. at 589, 597.  In <u>Kumho Tire Company v. Carmichael</u>, 526 U.S. 137 (1999), the Supreme Court clarified that the "gatekeeping obligation" is not limited to "scientific" expert testimony, but applies to all expert testimony.  In other words, Rule 702 requires a district court to satisfy itself that the proposed expert testimony will assist the trier of fact, before permitting the trier of fact to assess such testimony.  <u>Id.</u> at 148-149.  The proponent of the expert must establish admissibility by a preponderance of the evidence.  <u>Nelson v. Tenn. Gas Pipeline, Co.</u>, 243 F.3d 244, 251 (6th Cir. 2001).

### 1. Wayne Esch

The first <u>Daubert</u> motion brought by Rover concerns Wayne Esch, a realtor based in Washtenaw County, Michigan.  Esch was retained by Defendants to assess the effect of the Rover pipeline on the following property tracts: (i) MI-WA-006.000 and MI-WA-009.500 (owned by Barry Kenyon/BVK Holdings, LLC); (ii) MI-WA-052.000 (owned by Jean and Matthew Little, Trustees of the Little Trust ("Little Trust")); (iii) MI-WA-058.000 (owned by William and Karen Zimmer); (iv) MI-WA-059.000 and MI-WA-059.500 (owned by L&B Schaible, LLC); and (v) MI-WA-064.000-T (owned by Cynthia and William Kemner).[1]  Esch ultimately concluded that the Rover pipeline "will have a severe and negative impact on the marketability of the properties in the future," to the tune of a 25% decrease in value for each property.  Esch Decl., Ex. 1 to Defs. Mot., ¶ 10 (Dkt. 816-2).  Esch also opined that the location of the properties made them ideal for residential subdivision development, but the presence of the pipeline "will have a substantial negative impact on their ability to be developed."  Ex. D to Esch Decl. at PageID.9613.  Rover argues that Defendants have failed to satisfy any of the requirements set forth in Rule 702.  The Court will address each requirement in turn.

Rover argues that while Esch has experience as a realtor, he does not have any relevant experience with properties encumbered by pipelines or large properties sold for potential development as residential subdivisions.  It notes Esch's assertion that a pipeline on the subject properties would cause a 25% loss in value cited to only one previous experience where one of his buyers insisted on a discount because of a pipeline.  Rover notes the Sixth Circuit's holding in <u>Berry v. City of Detroit</u>, 25 F.3d 1342, 1351 (6th Cir. 1994), that "[t]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications

---

[1] Esch was also retained to opine on tract MI-WA-017.000, owned by Sue and Sally Schiel.  The Schiels have since been dismissed from this case.

provide a foundation for a witness to answer a specific question." Defendants argue that Esch's "experience and specialized knowledge as a successful realtor" in the Washtenaw County market qualify him as an expert under Rule 702. They note that he has been in the top five percent of realtors in Washtenaw County by annual sales each of the past ten years. See Ex. D to Esch Decl. at PageID.9614.

Esch's experience as a longtime realtor in Washtenaw County satisfies the first requirement under Rule 702. While Esch could only name one specific transaction where a buyer demanded a price decrease due to an oil pipeline, he noted that he had dealt with several other instances of encumbrances, including electrical lines. He also has been working for over fifteen years in Washtenaw County, where each of the properties at issue is located. Putting aside the methods used to come to his conclusion, his credentials qualify him to testify regarding the effect a pipeline would have on the resale value of property in the county.

Despite his experience, Esch did not base his conclusion regarding the property values on sufficient facts or data, or reliable principles and methods. While the Court in Daubert set forth factors to consider when determining whether an expert's methods are reliable, including whether the methods have been tested, subject to peer review, and generally accepted in the scientific community, the "factors utilized in Daubert may be of limited utility in the context of non-scientific expert testimony." First Tennessee Bank Nat. Ass'n v. Barreto, 268 F.3d 319, 334 (6th Cir. 2001). "In some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases 'the relevant reliability concerns may focus upon personal knowledge or experience.'" Id. at 335 (quoting Kumho Tire, 526 U.S. at 150). "[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." Id. (quoting Kumho Tire, 526 U.S. at 153).

Defendants argue that Esch should be permitted to testify based solely on his past experience, because his testimony is only being offered to "educate the jury as to the condition of the real estate market where these properties are located." Def. Resp. at 7. Esch's report does begin by discussing the nature of the Washtenaw County market, noting that "[m]any environmental conscience [sic] Buyers refuse to live close to gas pipelines, others will consider purchasing only if the price is adjusted." Ex. D to Esch. Decl. at PageID.9610. However, he then gets into much more detail regarding the effect of the Rover pipeline on the subject properties. Esch stated in his report and at his deposition that the highest and best use for each of the properties is to convert them into residential subdivisions, and that the presence of the Rover pipeline will cause this land to decrease in value by 25%. In coming to the precise conclusion in his report that the subject properties will lose a quarter of their value, Esch relies solely "upon my real estate experience in Washtenaw County." Id.

Although the Daubert factors may not be applicable where, as here, the issue involves a non-scientific opinion, the trier of fact needs to be given some basis, other than a generalized reference to experience, when being presented with a statistical conclusion regarding the value of specific properties. See Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir. 2012) ("Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."). Esch conceded that he did not inspect any of the subject properties, compare sales data for properties with and without pipeline easements, review or conduct any studies examining the effect of pipelines on home values, nor did he consider the fact that three of the properties already have pipeline easements, a fact that might well alter his 25% devaluation estimate. When asked what market data he used to arrive at his 25% conclusion, he once again relied on his anecdotal experience of "taking buyers out to look at properties and the market feedback that they

give to me based upon that." Id. at 54.[2] Esch Dep., Ex. 2 to Defs. Mot., at 54, PageID.9629 (Dkt. 816-3).

While Defendants now try to characterize Esch's testimony as a mere general discussion of the Washtenaw County housing market, this is belied by Esch's own report and testimony, which give a precise percentage of how much the landowners can expect their property to be devalued by the Rover pipeline. The failure to rely on any meaningful data in coming to his conclusion regarding the 25% devaluation of the Kenyon, Little Trust, Zimmer, L&B Schiable, and Kemner properties renders this portion of Esch's opinion unreliable. As a result, this portion of his testimony is excluded.[3] However, based on his experience, the Court will allow him to testify about the market generally, as well as the highest and best use of the property.

## 2. Mark Koeninger and Eric Gardner: PIR/Stigma Theory

---

[2] Regarding his assertion that the pipeline will hinder the ability to convert the subject properties into residential subdivisions, their highest and best use, Esch conceded that he did not determine whether the properties could be reclassified as residential, or whether building permits would issue. He instead relied on a search of the Multiple Listing Service, and saw that some houses had sold in the general area of the subject properties. While he failed to consider the zoning of the properties, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Clay v. Ford Motor Co., 215 F.3d 663, 669 (6th Cir. 2000) (quoting Daubert, 509 U.S. at 596).

[3] Defendants rely on a ruling by the Michigan Court of Appeals in Lenawee Co. v. Wagley, 836 N.W.2d 193, 209 (Mich. Ct. App. 2013), in which the county appealed a ruling by the trial court allowing an appraiser to testify on behalf of the landowner. Despite the fact that the appraisal was not based on "professional literature or studies," the court held that testimony was admissible because it "was limited to the marketability of the property and the necessity for disclosures." As discussed above, Esch's testimony goes beyond a general discussion of marketability and disclosures; it gives a precise percentage for the value lost as a result of the Rover pipeline. The Wagley court also indicated that the appraiser had specific experience with the easements involved in that case, noting his "expertise and its direct relationship to the facts of the case." Id. at 209. While Esch is qualified to speak on real estate valuations in Washtenaw County, his experience, without more, is insufficient to conclude that Defendants' properties will lose a quarter of their value from the pipeline.

Rover next seeks to exclude the opinions of Mark Koeninger, an architect, and Eric Gardner, an appraiser, both of whom were retained by the Kenyon, Little Trust, Zimmer, Schiable, and Kemner landowners. Gardner appraised all six of the properties, and based his appraisals in part on Koeninger's potential impact radius ("PIR")/stigma theory. This theory relies on the Pipeline and Hazardous Safety Materials Administration's ("PHMSA") definition of PIR, which it defines as "the radius of a circle within which the potential failure of a pipeline could have significant impact on people or property." 49 C.F.R. § 192.903. Koeninger estimates that the PIR for the Rover pipeline is 1,100 feet on each side of the pipeline. According to Koeninger, this potential blast radius causes a stigma which devalues not just the land on which the pipeline is situated, but also the land that is within the PIR, and even the land outside the PIR. Koeninger estimates that the land within the radius is devalued anywhere from 25% to 40%, with the land outside of the PIR losing 10% of its value.

Defendants now seek what is sometimes referred to as "severance damages," which arise where a "partial taking not only deprives the owner of the property that is actually taken but also diminishes the value of the property remaining to the owner." United States v. 91.90 Acres of Land, Situate in Monroe Cty., Mo., 586 F.2d 79, 86 (8th Cir. 1978). Koeninger and Gardner assert that because of the stigma caused by the pipeline and its PIR, the value of the property remaining to Defendants has diminished. Rover now moves to exclude this opinion, on the grounds that it is not based on sufficient facts or data, is not the product of reliable principles and methods, and even if it was, the principles and methods were not reliably applied to the facts of the case.

Rover asserts that neither Gardner nor Koeninger relied on sufficient facts or data when conducting the appraisals, or formulating the PIR/stigma theory, respectively. Rover's main point of contention is that while the putative experts reviewed market data to determine the "before take"

value of Defendants' land, they did not consult any market data within Washtenaw County to determine the "after take" value of the properties.

A review of Gardner's reports shows that, in addition to reviewing regional and neighborhood data, he began by comparing each subject property with four to five comparable properties to determine each property's "before take" value. See, e.g., Kemner Appraisal, Ex. 1 to Pl. Mot., at 28, PageID.9745 (Dkt. 817-2). He also toured each property, met with the landowners, and spoke with local officials. He then adjusted this value based on Koeninger's PIR/stigma theory, a theory which Koeninger became familiar with after reviewing a 2002 study of the effects of the Guardian Pipeline in Wisconsin ("the Guardian Pipeline study"), as well as a study in Right of Way magazine, in order to arrive at the "after take" valuation. Id. at 13. A review of Koeninger's deposition indicates that he reviewed some market data — what he refers to as "demographic information" — to get a general sense of the housing market in Washtenaw County. See Koeninger Dep., Ex. 8 to Pl. Mot., at 55, PageID.10134 (Dkt. 817-9). In addition to the Guardian Pipeline Study, he reviewed zoning information and master plans. Id. He also used the county auditor's surveys and records to determine which easements already existed on the subject properties. Id. at 50.

Rover contends that, instead of relying on the PIR/stigma theory and two studies that supposedly support that theory, Gardner should have compared the subject properties to comparable properties that sold after being encumbered by pipelines in order to determine the "after take" value of the properties. See Rockies Exp. Pipeline LLC v. Hopkins, No. 1:08-CV-00751-RLY, 2012 WL 1622532, at *5 (S.D. Ind. May 9, 2012) ("One would expect that if the presence of an underground natural gas pipeline makes residential development economically non-viable, then some market data would exist to evidence that."). Rover takes issue with Gardner's and Koeninger's failure to examine sales data along the Rover pipeline to determine whether news

of the pipeline had caused properties to depreciate. However, there is authority that holds that "[c]omparable sales are only one method of estimating property values. Other methods may be used 'where no comparable sales exist.'" Vector Pipeline, L.P. v. 68.55 Acres of Land, 157 F. Supp. 2d 949, 956 (N.D. Ill. 2001) (quoting United States v. 99.66 Acres of Land, 970 F.2d 651, 655 (9th Cir. 1992)). Gardner testified that such comparable properties do not exist at this time, because while there are some properties with six to twelve inch pipelines, the Rover pipeline's forty-two inch diameter makes it distinguishable. Gardner Dep., Ex. 9 to Pl. Mot., at 43 (Dkt. 817-10); see also id. (describing the Rover pipeline as a "game changer."). Gardner instead relied on the PIR and literature on the stigma of pipelines to determine the decrease in value caused by the Rover pipeline.

Rover insists that comparable sales do exist, noting a study by Integra Realty Resources ("Integra Study"), to which Gardner and Koeninger were privy, which analyzed homes on and off other large pipelines in Ohio, Virginia, New Jersey, Pennsylvania, and Mississippi. The report ultimately concluded that "there is a sales frequency for homes 'on' a pipeline that is consistent with those 'off' a pipeline. This indicates that the presence of a pipeline does not inhibit sales." IRR Report, Ex. 11 to Pl. Mot., PageID. 10303 (Dkt. 817-12). Contrary to Gardner's conclusion, the report also concluded that the "size of the pipeline has no effect on sales price in the study areas." Id.

While this report may contradict the PIR/stigma theory, it is well-settled that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Clay, 215 F.3d at 669. Gardner was entitled to rely on his experience and the literature he reviewed in order to conclude that the PIR/stigma effect was real. See Vector Pipeline, 157 F. Supp. 2d at 957

("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.") (internal citation and quotations omitted).

Rover also takes issue with the literature relied on for Gardner's "after take" valuation, first arguing that the study of the stigma caused by the Guardian Pipeline is unreliable because it consisted of a phone survey of individuals selected at random, rather than a survey of only active home buyers. A review of the study reveals that it conducted a thorough, scientific survey of homeowners regarding how the then-forthcoming Guardian pipeline in Wisconsin would affect their home-buying decisions. See Guardian Pipeline Study, Ex. A to Defs. Resp. to Mot. to App. Comm. (Dkt. 689-2). The study began by asking respondents generally whether a pipeline would impact their decision to purchase a home, and then followed up by asking by what percentage the property would have to be reduced for them to make a purchase. Id. at 3-7. While Rover believes the study should have only surveyed those active in the market, this critique does not render the entire study unreliable. Rover does not actually critique the Right of Way magazine article, but instead notes the article's recommendation that appraisers also analyze comparable sales to determine the "after take" value. However, as noted above, Gardner insisted that, in light of the size of the Rover pipeline, there were not comparable sales in Washtenaw County.[4] The Court concludes that Koeninger and Gardner could reasonably rely on both pieces of literature in lieu of comparable sales in order to satisfy Rule 702(b)'s mandate that they rely on sufficient facts and data in formulating their opinions.

---

[4] Rover also argues that the opinions of Gardner and Koeninger are unreliable because they did not incorporate the opinions set forth in the Final Environmental Impact Statement created by FERC when it approved the pipeline, and a report by Integra Realty Resources, which concluded that natural gas pipelines do not create a "stigma impact" on property values. Pl. Mot. at 10. However, as noted by Defendants, they "were not required to match [the Plaintiff] study for study or produce evidence of a particular type." Vector Pipeline, 157 F. Supp. 2d at 957.

The next issue concerns whether Koeninger's PIR/stigma theory itself is the product of reliable principles and methods. As noted above, "Daubert provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony. These factors include: testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." In re Scrap Metal Antitrust Litig., 527 F.3d 517, 529 (6th Cir. 2008) (internal citation and quotations omitted).

Rover contends that the PIR/Stigma theory "has failed" when tested, ostensibly referring to the Integra study, and has not been the subject of peer review or publication. However, as noted above, it has found support in the Guardian Pipeline Study, and in the study published in Right of Way Magazine. While Rover notes that a court in the Southern District of Ohio explicitly found that Koeninger's PIR/stigma theory possessed a "fundamental weakness," see Rockies Exp. Pipeline, LLC v. 4.895 Acres of Land, More or Less, in Butler Cty., Ohio (Pipeline Right-Of-Way Servitude), No. 2:08-CV-554, 2011 WL 1043493, at *1 (S.D. Ohio Mar. 16, 2011), the court held that the PIR was properly considered and was "an interesting theory that lacks persuasive force under the circumstances of this case." Id. This lends more support to the argument that the weaknesses in the PIR/stigma theory go towards the theory's weight, not its admissibility.[5]

Lastly, Rover argues that, even if the PIR/stigma theory is reliable, Gardner and Koeninger did not reliably apply the theory to each tract they evaluated. It argues that the theory was misapplied because the putative experts failed to take into account that three of the properties — those owned by Kemner, Schiable, and Zimmer — were already encumbered with pipelines. As

---

[5] Rover also argues that Gardner violated the Uniform Standards of Professional Appraisal ("USPAP") when he failed to use comparable sales for his "after-take valuation." Gardner asserts in his report that the use of PIR/stigma theory is a valid sales comparison approach, and that the report thus complies with the USPAP. Like with Rover's other objections, this issue may be used to impeach Gardner; it does not render his opinion inadmissible.

a result, Rover argues, the theory should have led to a diminished "before take" value in light of the preexisting pipelines.

In Gardner's expert reports on the Kemner, Schiable, and Zimmer properties, he acknowledges that there are existing pipelines on the properties, but concedes that "the size, pressure and contents of the pipe are unknown and therefore not included in this report." See, e.g., Kemner Appraisal, Ex. 6 to Pl. Mot., at PageID.10080 (Dkt. 817-17). The failure to consider the potential stigma of the existing pipelines on the "before take" value of the Kemner, Schiable, and Zimmer properties allows for the inference that Gardner did not faithfully apply the PIR/stigma theory. Even allowing for their contention that the Rover pipeline is a "game changer" in terms of its size, it stands to reason that under the PIR/stigma theory, the "before take" value of the three pieces of property would at least be marginally depressed by the purportedly smaller preexisting pipelines. The failure to at least consider their impact on the property values makes it appear as though Gardner was attempting to inflate the "before take" value of the properties, so that he could then apply the PIR/stigma theory to the Rover pipeline to maximize Defendants' just compensation.

Despite this apparent flaw in Gardner's appraisals, the Court holds that it is not grounds for a wholesale exclusion of Koeninger's PIR/stigma theory, or Gardner's application of the theory to his appraisals. As noted above, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Clay, 215 F.3d at 669. It is for the trier of fact to determine whether, in light of the apparent disparity in size between the preexisting pipelines and the Rover pipeline, Gardner was correct in choosing not to apply the PIR/stigma theory to determine the "before take" value. As a result, the Court holds that the testimony of Koeninger is admissible, as is the testimony of Gardner as it pertains to his application of the PIR/stigma theory.

### 3. William Lawrence and Eric Gardner: Cost to Cure

The next <u>Daubert</u> motion concerns William Lawrence, an arborist retained by the Kemner, Little Trust, and Zimmer Defendants, as well as Gardner's incorporation of Lawrence's opinions into his appraisals. Rover argues that Lawrence's opinion should be barred because his method of calculating the value of trees felled on the subject properties, as well as the cost to replace those trees, is not reliable under Rule 702. When evaluating the trees felled, Lawrence applied the trunk formula method, which values each tree distinctly from the land on which it was situated. Defendants' appraiser, Gardner, then took Lawrence's valuation of the felled trees, and added that amount to his appraisal of the land itself. Rover argues that because the rule in Michigan, known as the unit rule, requires that land be valued as an integrated whole, rather than as a sum of its components, Lawrence's opinion and reports, as well as Gardner's incorporation of Lawrence's opinion, should be excluded as evidence of just compensation due.

As a threshold matter, Defendants argue that Rover is bound, as a contractual matter, by the Federal Energy Regulatory Commission's ("FERC") Certificate of Public Convenience and Necessity and Rover's Final Environmental Impact Statement ("FEIS") to pay them the value of the trees as damages, in addition to the just compensation owed to them for the diminution in their land's value. Defendants argue that while they "do not challenge the general utility of the 'unit rule,' Rover's conduct in agreeing to the terms contained within the FEIS has waived its application to the issue of the trees removed from Defendants' properties." Defs. Resp. at 7-8.

There are numerous problems with Defendants' theory that the Certificate of Public Convenience and Necessity and FEIS can contractually bind Rover to pay damages above and beyond just compensation. To begin, Defendants do not provide any cases or other authority where an individual (or group of individuals) successfully brought a breach of contract action as a third-

party beneficiary against the drafter of an environmental impact statement, or the grantee of a Certificate of Public Convenience and Necessity.

Even assuming the Certificate and the FEIS are a contract, and that Defendants have standing to assert a claim under that contract, a review of both documents does not show a promise to provide damages for the trees in addition to any just compensation. Defendants highlight language in the FEIS that states that Rover is required to compensate the landowners for "damages incurred during construction," and that if there are trees of commercial or other value that have to be removed during construction, "Rover would allow the landowner the right to retain ownership of the trees and negotiate with them regarding the disposition of the trees." See Defs. FEIS Excerpt, Ex. A to Defs. Resp., at PageID.12648-12649 (Dkt. 838-2). This language does not establish a promise by Rover to provide damages above and beyond just compensation. Indeed, another section of the FEIS, omitted by Defendants, explicitly addresses the method of compensation for the forthcoming tree removal. Noting that roughly 3,000 acres of forested land would be affected by the project, Rover stated that it "retained appraisers to help determine property values and fair market value." Pl. FEIS Excerpts, Ex. 1 to Pl. Reply, at PageID.12871 (Dkt. 850-1). It also stated that "[l]andowners would be compensated for any marketable timber that is removed from their property during construction." Id. The FEIS makes clear that this compensation will be determined through negotiation between Rover and the landowners, or if necessary, through eminent domain proceedings.

Finally, as noted by Rover, even if there was evidence that it breached the FEIS and Certificate, Federal Rule of Civil Procedure 71.1, the rule governing condemnation cases, "provides that other than an answer, no pleading or motion asserting any additional defense or objection shall be allowed by the defendant." United States v. Banisadr Bldg. Joint Venture, 65 F.3d 374, 380 (4th Cir. 1995) (holding that breach of contract counterclaim was barred in an

eminent domain proceeding).  As a result, the FEIS and Certificate do not entitle Defendants to any amount of above just compensation.[6]

Turning to the admissibility of Lawrence's opinion, Rover argues that it should be excluded because he determined a value for the trees that was separate and distinct from the value the trees may have contributed to the fair market value of the underlying land as a whole.  Michigan law, which governs here under the Natural Gas Act, see Columbia Gas Transmission Corp. v. Exclusive Nat. Gas Storage Easement, 962 F.2d 1192, 1199 (6th Cir. 1992), allows for application of the unit rule, which states that "the value of natural physical assets . . . will not be valued separately from the land." Muskegon Cty. v. Bakale, 303 N.W.2d 29, 30 (Mich. Ct. App. 1981).  The court in Bakale stated that

> Where land taken in eminent domain has . . . trees capable of being converted into lumber, these circumstances may be considered so far as they affect the market value of the land; but part of the realty cannot as a rule be separately valued for its materials, trees, etc., as an item additional to the value of the land for the purpose of sale.

Id. (quoting 26 Am. Jur. 2d Eminent Domain § 279).

However, contrary to Rover's assertion, the unit rule is not the exclusive measure of damages in Michigan where a partial taking is at issue.  "Generally, in eminent domain cases a condemnee's damages are measured by the fair market value of the property taken. However, where . . . a partial taking occurs, it is possible for the property not taken (the remainder) to suffer damages attributable to the taking.  These damages have been described as 'severance damages.'" Dep't of Transp. v. Sherburn, 492 N.W.2d 517, 519–520 (Mich. Ct. App. 1992).

---

[6] Defendants also note that Anthony Sanna, Rover's appraiser, testified that he did not consider the value of the trees when making his appraisal, because he was told they would be valued separately.  Defendants cite this testimony as evidence that Rover has changed its position regarding whether they would separately compensate the landowners for the trees, in addition to paying the loss of fair market value of the land itself.  Such a statement would go towards the reliability of Sanna's appraisal, not whether Defendants are legally entitled under either the FEIS, Certificate, or Michigan law to separate, distinct damages for tree loss.

"[T]he proper measure of damages in a condemnation case involving a partial taking consists of the fair market value of the property taken plus severance damages to the remaining property if applicable. To calculate the severance damages, the parties may present evidence of the cost to cure." Id. In order to calculate the cost to cure, Lawrence employed the trunk formula method, which is a way to value large trees that have been felled. Lawrence described the method as "an attempt to reflect the cost of a tree if you were to replace it. It is essentially the landscape installation and guarantee cost of smaller trees extrapolated with a mathematical formula to larger trees." Lawrence Dep., Ex. 5 to Pl. Mot., at 32, PageID.10697 (Dkt. 819-6).

Rover does not contest that the trunk formula method is a reliable methodology for determining the cost to cure. It argues that Lawrence's opinion should be excluded because he cannot prove that the cost to cure will actually decrease the amount of severance damages, and correspondingly increase the parcel's value. Rover notes the court's ruling in Sherburn that "curing," by its very nature, "decreas[es] the amount of severance damages and correspondingly increase[es] the parcel's market value." Sherburn, 492 N.W.2d at 520. Rover contends that because Lawrence does not assert that he knows the parcel's actual market value, he has no way of knowing whether the proposed replacement of the felled trees would actually cause the property to appreciate. However, such knowledge does not seem necessary for Lawrence to conclude that curing the felled trees would cause an increase in the property's value. The Michigan Tree Valuation Guide, relied on heavily by both parties, begins by stating that "[t]rees and other landscape plants have a value." Mich. Tree Guide, Ex. F to Defs. Resp., at 4, PageID.12667 (Dkt. 838-7). The guide notes that, in addition to aesthetic value, it is widely accepted that trees provide functional value, serving to abate noise, provide screening, and traffic control. Id. Indeed, it is hard to imagine a scenario where expending the cost to cure would somehow increase the severance damages, and correspondingly decrease the property value. Further, as noted infra,

Lawrence has provided testimony that each of the trees at issue provides distinct value to the subject properties.

Lastly, Rover argues that, while the trunk formula method is reliable, it was not reliably applied by Lawrence. It notes the statement in the Michigan Tree Valuation Guide that the guide is meant to "provide[] a framework of the acceptable practices or methods used to value trees in maintained landscapes." Id. at 5, PageID.12667. The guide cautions that "[i]t is not intended to be used as a framework for determining the value of trees outside of landscaped settings such as woodlots and fencerows where the tree does not add distinct value to the landscape through attributes such as aesthetics, shading, etc." Id. Rover points to Lawrence's testimony that the felled trees on the Kemner, Little Trust, and Zimmer properties were located in woodlots and fencerows. Lawrence Dep. at 18, PageID.12684. Based on this testimony, Rover argues, the trunk formula method should not have been applied to the trees on the subject properties.

A review of Lawrence's deposition and report indicate that he applied the trunk formula method reliably. The Michigan Tree Valuation Guide specifically provides that it can be used as a framework for trees located in woodlots and fencerows, provided that those trees add "distinct value to the landscape through aesthetics, shading, etc." Mich. Tree Guide at 5. Lawrence testified that the trees on each subject property provided distinct value. As to the Little Trust property, Lawrence testified that the trees contributed to the owners' recreational use of the property. Lawrence Dep. at 36-37, PageID.12688-12689. Lawrence testified that the property had long been used for hunting, and that the trees played an important role in this activity. Id. at 37, PageID.12689. Regarding the Zimmer property, Lawrence testified that the trunk formula method was appropriate because the area around the trees was regularly mowed and maintained as if it were in a landscape setting, which contributed to the home on the property. Id. at 38, PageID.12689. Finally, with regard to the Kemner property, Lawrence believed the trunk formula

method was appropriate because the owner intended to subdivide the property, with plans to preserve the trees as a nature preservation area for the subdivision. Id.

Lawrence also testified that based on his extensive experience, which Rover does not contest, he believed the trunk formula method "comes closest to the true value of the trees on those properties based on the existing land uses." Id. at 36. Because he considered the distinct value of the trees, and his own experience, Lawrence reliably applied the trunk formula method to the subject properties. His opinion is thus admissible as evidence of the cost to cure.

Rover also contends that Gardner's appraisal should be excluded because he failed to apply the unit rule. It argues that he merely added Lawrence's tree valuations to his opinion of diminution in market value of the Kemner, Little Trust, and Zimmer properties in order to arrive at the amounts due. Defendants do not address this argument in their response.

There are two different ways Gardner could have arrived at the amount due under Michigan law. He could have applied the unit rule, whereby he would have considered how the trees added to fair market value of the subject properties as a whole, and correspondingly, how much the removal of those trees lowered the fair market value of the property, if at all. Such a valuation would have conformed to the unit rule as announced in Bakale. Alternatively, Gardner could have arrived at the damages due to the landowners by applying the method set forth in Sherburn. As noted above, the court in that case held that "the proper measure of damages in a condemnation case involving a partial taking consists of the fair market value of the property taken plus severance damages to the remaining property if applicable." Sherburn, 492 N.W.2d at 520.

Gardner appears to have a taken a third course. For each landowner, he assessed how much Rover's partial taking lowered the value of the entire property (not just the fair market value of the property taken), to arrive at his "value conclusion," i.e. how much Rover owed the landowner for the diminution of the entire tract. He then added the cost of the trees as estimated by Lawrence on

top of his "value conclusion" in order to arrive at the total amount due to the landowner. This method involves double-counting — by accounting for the lowered value triggered by the partial taking and then adding the value of lost trees. Because this methodology is not supported under Michigan law, it cannot be said that Gardner's appraisal is reliable.

Gardner's appraisals as to the Kemner, Little Trust, and Zimmer properties are excluded. Lawrence's testimony is relevant to the extent that Defendants seek to introduce evidence of severance damages.

### 4. Frank Tokar, Jr.: Mineral Valuation

Rover next seeks to exclude the opinions of Frank Tokar, Jr., an expert retained by Defendant Little Trust to opine on the value of mineral deposits on their property. Like with the opinion of Lawrence, the Little Trust's arborist, Rover seeks to exclude Tokar's testimony and report on the grounds that Tokar's opinion is "fundamentally flawed" because he considered the value of the mineral deposits separately from the value they contribute to the land as a whole, thus violating the unit rule. He also argues that Tokar's opinion is not reliable because the factual assumptions underlying his opinion are false. Rover again seeks to exclude Gardner's appraisal, this time on the grounds that he has simply taken Tokar's valuation of the minerals and added it to the decrease in land value to arrive at the Little Trust's just compensation.

This brings the Court to Rover's first argument for exclusion – that Tokar's opinion is inadmissible because he values the minerals independently from the land. This is not grounds for exclusion. In order for an appraiser to take into account the contributory value of the minerals to the land as a whole, it is instructive for the appraiser to first understand how much the minerals are worth. See Columbia Gas, 962 F.2d at 1199 (holding that while, under Ohio law, mineral deposits are not valued separately from the land on which they are located, it is still proper to admit evidence that the land contains valuable deposits in order to determine the land's fair market

value).  Further, Tokar's opinions are probative of potential severance damages.  See Sherburn, 492 N.W.2d at 520.

Rover next argues that Tokar's method for determining the minerals' worth does not pass muster under Rule 702 because the assumptions underlying his valuation are "demonstrably false." In his report, Tokar valued the mineral deposits at $448,000.  Rover contends that this valuation was entirely dependent on Tokar's assumption that, but for the Rover pipeline, the Little Trust would have contracted with Stoneco, a construction materials provider that purchased land adjacent to the Little Trust property, to mine the minerals on the Little Trust's land.  As initial matter, it does not appear that Tokar limited his valuation to a scenario where Stoneco would mine the minerals on the Little Trust's property; his report states that his valuation is based upon "the present value that would be realized by an owner if leased to an operator, such as Stoneco of Michigan or other mining company capable of conducting such operation."  Tokar Report, Ex. 4 to Pl. Mot., at 9, PageID.10858 (Dkt. 820-5) (emphasis added).

Assuming Tokar limited his estimation to Stoneco, Rover argues that he had no basis to believe that the company would have been interested in mining the Little Trust minerals.  It notes that in private communications between Tokar and Stoneco, Tokar represented to the company that the amount of minerals on the Little Trust property was less than the amount necessary for mining to be economically feasible for Stoneco.  During his deposition, Tokar testified that a property would need to contain approximately 600,000 tons of minerals for mining to be worthwhile.  Tokar Dep., Ex. 3 to Pl. Mot., at 93, PageID.10843 (Dkt. 820-4).  In his emails with Stoneco, Tokar estimated that there was a total of 530,000 tons of minerals on the Little Trust's property.  See 4/26/2017 Email, Ex. 5 to Pl. Mot. (Dkt. 820-6).  Rover also notes estimates by Stoneco that there would be less minerals than Tokar represented.  However, in his expert report, issued a month after his communication with Stoneco, Tokar concluded that there was 673,000

tons of minerals, above the threshold to make mining economically feasible. Tokar Report at 8, PageID.10857.

To the extent Rover argues that this inconsistency in estimates renders Tokar's opinion unreliable, it is well-settled that Rule 702 "is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1392 (Fed. Cir. 2003) (quoting Advisory Committee Note to Rule 702); see also Pipitone v. Biomatrix, Inc., 288 F.3d 239, 250 (5th Cir. 2002) ("The fact-finder is entitled to hear Dr. Coco's testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which Dr. Coco relied are accurate."). Tokar's varying estimates of the amount of mineral deposits on the Little Trust property is not grounds for exclusion of his opinion.

Even assuming mining the Little Trust property would be economically feasible, Rover argues that it is entirely speculative whether Stoneco would have agreed to lease the property but for the Rover pipeline. In support of this assertion, Rover submits the declaration of Jay Ellis, an administrative manager for Stoneco. See Ellis Decl, Ex. 11 to Pl. Mot., ¶ 1 (Dkt. 820-12). Ellis states that prior to its most recent discussions with the Littles in April 2017, Stoneco discussed mining the property in 2015, but never reached an agreement. Id. ¶ 6. According to Ellis, over the course of their most recent discussions with the Littles, they were provided with samples of the minerals from Tokar, and determined that "the quality and the quantity of the materials were not worth the investment." Id. ¶ 9. Ellis stated that while the pipeline may have affected one of the two areas to be mined, Stoneco would likely not have been interested regardless of the pipeline. Id. ¶ 10. Stoneco also indicated that it would not be ready to mine the materials until at least 2020, which affects Tokar's royalty calculation. See Stoneco Annual Report, Ex. 12 to Pl. Mot., at PageID.10966 (Dkt. 820-13).

In response, the Little Trust notes that construction of the Rover pipeline was already before the FERC at the time of the 2015 negotiations, which likely led to the failure to reach an agreement. See Def. Resp. at 11. They also note that Stoneco, originally a Defendant in this matter, has since settled with Rover and has provided materials as part of the construction of the pipeline. Id. at 11-12. As with Rover's argument regarding the amount of minerals to be mined, whether Stoneco was actually agreeable to mining the Little Trust property but for the Rover pipeline is a question for the trier of fact. While Ellis's declaration asserts that Stoneco was likely not going to enter an agreement due to factors aside from the Rover pipeline, the failure to reach a deal in 2015, shortly after the pipeline was proposed, as well as Stoneco's potential bias as a supplier of the pipeline, could lead the trier of fact to conclude that the pipeline did in fact prevent the Little Trust from reaching a mining agreement with Stoneco. The trier of fact is entitled to hear Tokar's opinion and assess his credibility in light of Ellis's rebuttal. See Pipitone, 288 F.3d at 250.[7]

Finally, Rover again challenges Gardner's appraisal on the grounds that he reached his conclusion by simply adding Lawrence's mineral valuation on top of the amount of fair market value lost for the entire tract as a result of the Rover pipeline. The Court agrees. As noted above, Gardner's appraisal method improperly combines the unit rule and severance damages by

---

[7] Rover also argues that Tokar's opinion should be excluded because his report does not contain all the facts or data considered by Tokar in forming his opinion, as required by Federal Rule of Civil Procedure 26(a)(2)(B)(ii). It notes a statement in Tokar's report that "[s]ome information used in this report is proprietary . . . Because of this, details of some sources . . . or other aspects of the mineral mining operations cannot be presented in this report." See Tokar Report at 3. Rule 37(c)(1) provides that if information is withheld under Rule 26(a), "the party is not allowed to use that information or witness to supply evidence . . . unless the failure was substantially justified or is harmless." Tokar testified that the referenced information did not influence the methodology or his ultimate conclusion regarding the value, and that while the proprietary information was not attached to his report, these confidentially designated materials were produced in his work file. See Tokar Dep. at 123-124, PageID.12257. It thus appears that there was either no actual failure to disclose, or if there was, such failure was harmless.

calculating the loss in value for the entire tract (rather than just the portion taken) and then adding the value of the minerals and trees on top of that calculation. See United States v. 0.648 Acres or Land, No. CIV.A. 13-4722, 2014 WL 2533778, at *2 (E.D. La. June 5, 2014) ("[S]everance damages should not be assessed separately from the before-and-after method because the before-and-after method already includes severance damages in the calculation.").

As a result, Gardner's appraisal for the Little Trust property is excluded.[8]

### 5. Mike Israni and Richard Huriaux: Rebuttal to PIR/Stigma Theory

Defendants bring their first Daubert motion in response to the proposed testimony of Mike Israni and Richard Huriaux. Israni and Huriaux, engineers and former PHMSA employees, were retained by Rover for the sole purpose of rebutting the PIR/stigma theory set forth by Koeninger and adopted by Gardner in his appraisal. They state in their report that "the additional safety requirements that may be triggered by a larger PIR . . . are designed to equalize risk across a pipeline system." See Israni and Huriaux Report, Ex. A to Defs. Mot., at 7, PageID.11116 (Dkt. 822-3). Thus, according to the report, "the use of a PIR as an arbitrary marker of risk or the reflection of a PIR in property market value makes no sense." Id. Defendants argue that these putative rebuttal experts fail to meet any of the Rule 702 requirements.

The Court holds that the proposed testimony of Israni and Huriaux fails to satisfy Rule 702(a) because it will not help the trier of fact determine a fact in issue. "While an expert may opine on an issue of fact within the jury's province, an expert may not give testimony stating ultimate legal conclusions based on those facts." Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D.

---

[8] Rover also again argues that this method of appraisal violates the Uniform Standards of Professional Appraisal Practice, and that failure to abide by USPAP renders Gardner's opinion unreliable. Noncompliance with USPAP does not render testimony per se unreliable; courts have held that it bears on credibility rather than admissibility. See Whitehouse Hotel Ltd. P'ship v. C.I.R., 615 F.3d 321, 332 (5th Cir. 2010) ("[T]he tax court acted within its ample discretion in considering USPAP compliance as relevant to the weight Argote's report should be given, instead of whether it should be admitted.").

33, 48 (S.D.N.Y. 2016) (internal citation and quotations omitted). "Accordingly, courts exclude expert testimony that provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court." Id. (internal citation and quotations omitted).

Israni and Huriaux's report ultimately concludes that Koeninger has misused the PIR, which they contend was solely meant as an evaluation of risk, as a measure of property value. This legal conclusion is outside of their purview as engineers. Simply because PIR was created in order to mitigate risk along pipeline, does not mean that it can be summarily dismissed as an indicator of property values. Because the interpretation of the federal regulation establishing PIR falls beyond the expertise of Israni and Huriaux, their rebuttal testimony is excluded.

### 6. Anthony Sanna

The next Daubert motion is brought by Defendants Little Trust, Zimmer, and Kemner, owners of what have been identified as "timber tracts," which contained trees that were felled by Rover while constructing the pipeline. In addition to trees, the Little Trust seeks compensation for the loss of sand and gravel minerals on its property. Defendants argue that Rover's appraiser, Anthony Sanna of Integra Realty Resources, should be excluded from presenting his opinion because his appraisals failed to attribute any value to the trees and minerals at issue.

Defendants do not challenge Sanna's qualifications. Their argument is that Sanna's appraisal is unreliable because it focuses on an "extraordinary assumption" made by Sanna, defined as "uncertain information accepted as fact." See, e.g., Sanna Little Appraisal, Ex. A to Defs. Mot., at PageID.11286 (Dkt. 823-3). The extraordinary assumption at issue states that "[t]his appraisal does not address compensation for . . . commercial-grade timber . . . Specific instructions for this appraisal include the extraordinary assumption that Rover Pipeline, LLC will separately reimburse the owners for . . . commercial-grade timber damaged or removed during construction." Id. Sanna testified that Rover informed him "that part of our plan is to restore these to the original

condition so the appraisal doesn't need to reflect that."  Sanna Dep., Ex. D to Defs. Mot. at 171, PageID.11338 (Dkt. 823-6).  Defendants now argue that Sanna's assumption that only commercial-grade timber is compensable renders his appraisals unreliable.

In response, Rover notes Sanna's deposition testimony.  When asked whether the extraordinary assumption in his report regarding commercial-grade timber meant that Rover only agreed to reimburse landowners for commercial timber, Sanna testified that "I don't think our comment was intended to be all inclusive, that it was only going to pay for commercial timber." See Sanna Dep. at 178, PageID.11340 (Dkt. 823).  Sanna testified that his just compensation conclusion incorporated the contributory value of noncommercial trees; he stated that "our data had trees on the comparables.  So the comparables [that] sold with trees, we're giving them a value for any trees that may have been on that site prior to the take."  Id. at 179, PageID.11340.  As a result, it does not appear that either Sanna or Rover limited the compensation due to the property owners to just commercial-grade timber.  Consistent with the unit rule, Sanna considered the contributory value of timber found on comparable properties when conducting his appraisals.

Defendants also object to Sanna's failure to attribute any value to the mineral reserves found on the Little Trust property.  In his report, Sanna states that "[n]o opinion is expressed as to the value of subsurface oil, gas or mineral rights, if any, and we have assumed that the property is not subject to surface entry for the exploration or removal of such materials, unless otherwise noted in our appraisal."  Sanna Little Appraisal at 43.  Defendants argue that Sanna's "failure to even mention the presence of known extractable mineral deposits . . . represents deliberate chicanery on the part of the Plaintiff."  Defs. Mot. at 12.

Rover's decision to limit Sanna's consideration of the value of any subsurface minerals is permissible.  Rover notes that, under Michigan law, "[i]n determining fair market value, one must . . . determine the highest and best use of the property."  Detroit/Wayne Cty. Stadium Auth. v.

Drinkwater, Taylor, & Merrill, Inc., 705 N.W.2d 549, 557 (Mich. Ct. App. 2005).  "'Highest and best use' means the most profitable and advantageous use the owner may make of the property even if the property is presently used for a different purpose or is vacant, so long as there is a market demand for such use."  Id. (internal citation and quotations omitted).  With regard to alternate uses of condemned property, Michigan law holds as follows:

> To warrant admission of testimony as to the value for purposes other than that to which the land is being put . . . the landowner must first show: (1) that the property is adaptable to the other use, (2) that it is reasonably probable that it will be put to the other use within the immediate future, or within a reasonable time, and (3) that the market value of the land has been enhanced by the other use for which it is adaptable.

Id. at 560.

Rover argues that there are questions of fact regarding whether the Little Trust property would be adaptable from its current rural and agricultural use, and whether it is reasonably probable that the property would be put to use within a reasonable time.  Rover again notes the Ellis declaration, which casts doubt on the economic feasibility of mining the Little Trust property, and notes that Stoneco could not began any mining until sometime between 2020 and 2023.  It also argues that there is no evidence to show that adapting the land's use would enhance its property value.

Rover was entitled to rely on these facts when commissioning its expert.  It instructed Sanna not to consider subsurface minerals because it concluded that they essentially had no value.  Like with Tokar, a disputed factual predicate is not grounds for exclusion of an expert opinion.  See Pipitone, 288 F.3d at 250.

Defendants lastly argue that Sanna's appraisal method violated multiple USPAP standards, contained errors and omissions, and failed to apply an appropriate methodology, all of which resulted in unreasonable valuations.  Defendants do not elaborate on the alleged errors or omissions

(beyond previously noting their objection to the failure to consider the mineral reserves), and do not explain how Sanna's appraisal methods are inappropriate or violate USPAP. Indeed, one of the USPAP standards cited by Defendants requires appraisers to identify a property's "physical, legal, and economic attributes" when formulating a valuation. See Defs. Mot. at 13. Each of Sanna's appraisals determined the physical attributes, legally permissible uses, feasibility of development on the land, and its most productive use. See, e.g., Sanna Little Appraisal at 28-29.

For all of these reasons, Sanna's opinion is reliable under Daubert. [9]

### 7. Jeffrey Kern and David Falkenstern: Rebuttal to Frank Tokar

The final Daubert challenge concerns Defendant Little Trust's motion to exclude Rover's putative rebuttal experts Jeffrey Kern and David Falkenstern. Kern and Falkenstern were retained to opine on Tokar's expert report, which addressed the value of the subsurface minerals on the Little Trust property. As noted above, Tokar concluded that there were enough minerals on the property to make mining feasible for Stoneco, the gravel mining company that owns the land adjacent to the Little Trust's mineral deposits. In their report, Kern and Falkenstern agree with Tokar's conclusion that one section of the mineral deposits, identified as "Area A," will be rendered at least partially inoperable by the pipeline. They disagree that the other section of the mineral deposits, identified as "Area B," would be affected at all by the Rover pipeline.

The Little Trust argues that the opinions of Kern and Falkenstern fail to satisfy the requirements of Rule 702. It begins by arguing that the proposed testimony will not help the trier of fact to understand the evidence or determine a fact in issue, contending that the testimony is "nothing more than a straw man through which Plaintiff counsel [sic] can proffer a preview of its

---

[9] Defendants again set forth a cursory argument that Sanna's opinion is inadmissible under Fed. R. Evid. 403 for the same reasons that it does not pass muster under Daubert. They do not elaborate on why Fed. R. Evid. 403 bars Sanna's testimony, other than a conclusory allegation that his opinions "would serve only to mislead and confuse the jury." Def. Mot. at 15. Because the Court concludes that Sanna's testimony is reliable under Daubert, it is not barred by Rule 403.

closing arguments." Def. Mot. at 6. It notes Kern and Falkenstern's approval of Tokar's methodology, and contrast it with their conclusion ("an abrupt about-face") that Tokar's valuation was less accurate than the valuation arrived at by Rover's mineral expert, Glen Tolksdorf. While Falkenstern acknowledged that Tokar's decision to bore into the soil was more reliable than Tolksdorf's decision to simply look into the trench, Falkenstern Dep., Ex. B to Defs. Mot., at 26, PageID.11415 (Dkt. 824-4), he also testified that, these differing methodologies notwithstanding, Tolksdorf did a better job of defining which areas of the mineral deposits were within wetlands, which made mining impractical, id. at 49, PageID.11421. By acknowledging those portions of Tokar's report that they were in agreement with, and critiquing portions with which they disagreed, Kern and Falkenstern were acting as quintessential rebuttal experts. See Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc., 829 F. Supp. 2d 802, 835 (D. Minn. 2011) ("It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports.").

The trust next argues that the opinions of Kern and Falkenstern fail to satisfy Rule 702(b)-(d) because their opinions do not rely on sufficient facts and are not the result of a reliably applied methodology. It notes that neither Kern nor Falkenstern conducted a site visit or conducted their own independent analysis of the mineral deposits. It is well-settled that rebuttal experts are not required to independently assess the fact in issue. See E.E.O.C. v. Tepro, Inc., 133 F. Supp. 3d 1034, 1047 (E.D. Tenn. 2015) ("Rebuttal experts can properly respond[ ] to the content of [the original] expert witness' report and opinions."); see also Rivas v. Preston, No. 11-0193, 2012 WL 7782960, at *5 (W.D. Tex. Feb. 29, 2012) ("Rule 703 provides that an expert may base his opinion on facts or data in the case that the expert has been made aware of or personally observed.").[10]

---

[10] They also argue that Kern and Falkenstern's testimony will confuse and mislead the trier of fact in violation of Federal Rule of Evidence 403. Because their testimony is merely a critique of

Defendants also seek to strike a supplemental report submitted by Kern and Falkenstern. Their original report was served on Defendants on October 30, 2017, and Falkenstern was deposed on December 21, 2017. However, it was not until December 29, 2017 that counsel for Rover was provided with Tokar's entire work file. On January 26, 2018, subsequent to receipt of the file, Rover served on Defendants Kern and Falkenstern's supplemental report. Federal Rule of Civil Procedure 26(a)(2)(D)(ii) provides that expert rebuttals are to be provided within thirty days of the other party's disclosure. It is undisputed that the entirety of Tokar's work file was not provided to counsel for Rover until December 29, 2017. Because the supplemental report was served on January 26, 2018, less than thirty days after receipt of the entire file, Kern and Falkenstern complied with Rule 26.[11]

In any event, the supplemental report arrives at essentially the same conclusion as the original report – that while at least a portion of "Area A" of the Little Trust's property will be rendered unusable by the Rover pipeline, "Area B" of the property is unaffected by the pipeline. The supplemental report includes a few criticisms of Tokar that were not present in the original report, namely, that he did not conduct a feasibility study for mining on the property, and that his valuation did not take into account Stoneco's statement that they would not be able to mine the property for at least three years. While Defendants characterize the supplemental report as coming to a "completely different" conclusion than the original report, a review of the reports demonstrates

Tokar's valuation, it cannot be said that that the risk of misleading or confusing the trier of fact substantially outweighs the relevance of the testimony.

[11] Rule 26(e)(2), governing supplemental expert disclosures, states that any supplement to an expert report "must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Under Rule 26(a)(3), these disclosures are due at least thirty days before trial. The Court has suspended all trial dates until disposition of the pending motions in limine; however, because the supplemental report was submitted back in January 2018, the disclosure was made well in advance of any plausible trial date.

that this is simply not the case. As a result, the Court denies Defendant Little Trust's motion to exclude Kern and Falkenstern and to strike their supplemental report.

### B. Remaining Motions in Limine

#### 1. Consumers Energy Pipeline Explosion

Rover has brought a motion in limine seeking to exclude evidence of a November 2017 explosion of a Consumers Energy Pipeline in Orion Township (Dkt. 813). It argues that the explosion is irrelevant to the issue of just compensation, and thus should be excluded under Federal Rule of Evidence 401, and that even if the Court deems the incident relevant, any relevance is substantially outweighed by the risk of prejudice, in contravention of Rule 403.

The Court denies Rover's motion without prejudice. The Court must first allow trial proofs to proceed, including Koeninger's testimony regarding PIR. The Court will also have to review the video on its own to determine whether it is admissible as a demonstrative exhibit, or possibly admissible as evidence. Rover may renew its motion at trial.

#### 2. Pipeline Route Changes

Rover's next motion in limine seeks to exclude evidence of alternate routes for the Rover pipeline (Dkt. 814). Rover notes that Defendant Mark Selby seeks to introduce an expert report noting that the pipeline could have taken a less intrusive route through his property. It argues that pipeline routes are irrelevant to the issue of just compensation, and the FERC establishes the pipeline route and is the only venue in which to challenge the route.

Defendants have failed to file a response to this motion. The Court has reviewed the motion and concludes that it is meritorious. Federal Rule of Civil Procedure 401 states that evidence is relevant if it has "any tendency to make a fact more or less and probable than it would be without the evidence; and the fact is of consequence in determining the action." The sole issue to be determined is the amount of just compensation owed by Rover to Defendants. While alternate

routes may have resulted in a smaller taking to certain properties, they are not probative of how much compensation is owed to Defendants in light of the routes that were actually chosen by FERC. As a result, the Court grants Rover's motion to exclude all evidence of route changes, considerations, and alternative routes.

### 3. Construction Damages

Rover next seeks to exclude all evidence of damages caused to the subject properties by negligence, nuisance, or trespass during construction of the pipeline (Dkt. 818). Rover argues that such evidence is outside of this Court's jurisdiction, irrelevant or, to the extent the Court deems it relevant, substantially outweighed by the risk of unfair prejudice, confusion, and undue delay.

In response, the "non-Selby Defendants" (those Defendants other than Mark and Linda Selby) state that they have no objection to Rover's motion and do not intend to offer any evidence relating to tort claims against Rover. However, the Selby Defendants argue that this motion is premature because it was filed in advance of the deadline for all Selby-related pretrial motions. The Selbys state that because they intend to file a motion to consolidate in their companion case, Selby v. Rover Pipeline, LLC, No. 18-cv-10066, alleging tort claims, it is premature to exclude all tort related evidence. The Court disagrees. It is well-settled, and Defendants do not contest, that damages to the remainder property during construction are not compensable in a condemnation proceeding. See, e.g., United States v. 79.20 Acres of Land, More or Less, Situated in Stoddard Cty., Missouri, 710 F.2d 1352, 1356 (8th Cir. 1983). Thus, any evidence of alleged torts committed during the course of construction is excluded for this condemnation case. In the event the Selby's companion case asserting tort claims is consolidated with this case, any evidentiary issues relating to the tort claims will be addressed at that time.

### 4. Prior Easement Purchases and Settlement Negotiations

Rover also brings a motion in limine to exclude two categories of information that it believes Defendants seek to introduce to establish fair market value: (i) settlement discussions between Rover and Defendants; and (ii) the price paid for easements purchased on certain Defendants' properties by other condemning authorities prior to this litigation (Dkt. 821). In their response, Defendants state that they agree that any evidence of settlement discussions is barred by Federal Rule of Evidence 408. Thus, the only issue remaining is whether evidence of previous easements that were purchased on Defendants' properties is admissible.

"The traditional rule is that '[t]he price paid by a condemnor in settlement of condemnation proceedings or in anticipation of such proceedings is inadmissible to establish value of comparable land as such payments are in the nature of compromise to avoid the expense and uncertainty of litigation and are not fair indications of market value.'" Rockies Express Pipeline, LLC v. 4.895 Acres of Land, More or Less, In Butler Cty., Ohio, No. 2:08-CV-554, 2009 WL 1163054, at *1 (S.D. Ohio Apr. 28, 2009) (quoting United States v. 10.48 Acres of Land, 621 F.2d 338, 339 (9th Cir. 1980)). However, courts have held that such evidence may be admitted where the proponent of the evidence makes a preliminary showing that the purchase was actually voluntary. Id. There is also an exception if "the fact that parties were condemnor and condemnee either was not known or had no influence because the sale was not in connection with, or in anticipation of condemnation proceedings." Id. (quoting Transwestern Pipeline Co. v. O'Brien, 418 F.2d 15, 19 (5th Cir. 1969)). Defendants have also offered a ruling by the Southern District of Ohio in a suit concerning the Rover pipeline, in which the court allowed for the admission of prior easement purchases where the proponent lays a foundation establishing that the transaction was voluntary and conducted at arms-length. See 2/26/2018 Order, Ex. A to Defs. Resp. (Dkt. 834-1).

The Court believes this approach, rather than a wholesale exclusion of all prior easement purchases, as argued by Rover, is appropriate. As a result, evidence of these purchases will only

be admitted if the proponent lays an adequate foundation establishing that the transaction was voluntary, including that the transaction was conducted at arms-length, i.e., not influenced by the fact of the impending condemnation.  See Rockies Express, 2009 WL 1163054, at *1.

### 5. Pipeline Impact Study

The final motion in limine is brought by Defendants, and seeks to exclude a February 2016 report prepared by Integra Realty Resources on behalf of the Interstate Natural Gas Association of America entitled Pipeline Impact Property Value and Property Insurability (Dkt. 825).  Defendants argue that the study is inadmissible hearsay and that it is also barred by Rule 403, because its probative value is substantially outweighed by the risk of prejudice.

The Court denies this motion without prejudice.  A review of the briefing indicates that the parties dispute whether Sanna, Rover's appraiser, relied on the report in coming to his valuations, or merely "considered" the report.  Prior to ruling on this issue, the Court will need to hear Sanna's testimony at trial.  Further, whether the report is only admissible as rebuttal evidence is dependent on the testimony of Defendants' experts.  As a result, Defendants' motion is denied without prejudice.

## II. CONCLUSION

For the foregoing reasons, the Court (i) grants in part and denies in part Rover's motion as to Wayne Esch (Dkt. 816); (ii) denies Rover's motion as to Mark Koeninger and Eric Gardner (Dkt. 817); (iii) grants in part and denies in part Rover's motion as to William Lawrence and Gardner (Dkt. 819); (iv) grants in part and denies in part Rover's motion as to Frank Tokar Jr. and Gardner (Dkt. 820); (v) grants Defendants' motion as to Mike Israni and Richard Huriaux (Dkt. 822); (vi) denies Defendants' motion as to Anthony Sanna (Dkt. 823); (vii) denies Defendants' motion as to Jeffrey Kern and David Falkenstern and to strike their supplemental report (Dkt. 824); (viii) denies without prejudice Rover's motion as to the Consumers Energy explosion (Dkt. 813);

(ix) grants Rover's motion as to alternate pipeline routes (Dkt. 814); (x) grants Rover's motion as to construction damages (Dkt. 818); (xi) grants in part and denies in part Rover's motion as to prior easement purchases and settlements (Dkt. 821); and (xii) denies without prejudice Defendants' motion as to the pipeline impact study (Dkt. 825).

      SO ORDERED.

Dated:  July 6, 2018                    s/Mark A. Goldsmith

       Detroit, Michigan                MARK A. GOLDSMITH
                                        United States District Judge

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 6, 2018.

                    s/Karri Sandusky
                    Case Manager